# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| DEBBIE PHIPPS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>COUNTY OF MCLEAN, MCLEAN )<br>COUNTY NURSING HOME, and )<br>MATTHEW RIEHLE, )<br>)<br>Defendants. ) | Case No. 07-cv-1160 |

## O P I N I O N  &  O R D E R

Before the Court are cross-motions for summary judgment. Plaintiff filed her motion for summary judgment [Doc. 29] on April 1, 2008. On April 22, 2008, Defendants filed a motion for extension of time to respond [Doc.34] to Plaintiff's summary judgment motion. Also on April 22, 2008, Defendants filed a motion for summary judgment [Doc. 36]. For the reasons set out below, Plaintiff's motion for summary judgment is DENIED and Defendants' motion for extension of time and motion for summary judgment are GRANTED.

### BACKGROUND

In 2002, McLean County Nursing Home hired Plaintiff Debbie Phipps as a full-time Certified Nursing Assistant. Plaintiff usually worked the 11 p.m. to 7 a.m. shift and had every other weekend and every other Monday off. (Def.'s SJ Mem. SUMF ¶ 2) On October 2, 2006, the nursing home granted Plaintiff intermittent leave, under the federal Family and Medical Leave Act, due to a condition that

1

causes Plaintiff to suffer episodes of anaphylactic shock. (Ptf.'s SJ Mem. SUMF ¶ 4) Dr. Daniel Marley, who certified Plaintiff's need for medical leave, found that her episodes of shock were unpredictable and that the duration of her condition was unknown. (Def.'s SJ Ex. 3, Dr. Marley's Cert. at p. 1)  From October to mid-December of 2006, Plaintiff's use of her leave time was relatively sporadic. She was absent often, but not for weeks at a time. (Def.'s SJ Ex. 4, Phipps' Attendance Record at McLean County Nursing Home for October 2006 – January 2007)

At some point in mid December, Plaintiff spoke with Donald Lee, an administrator at the nursing home. During that conversation, Mr. Lee informed Plaintiff that she could not utilize accumulated paid sick-time in her personal "reserve" account unless she was absent from work for at least five consecutive days. (Def.'s SJ Mem. SUMF ¶ 14)  After the conversation, Plaintiff began a six-week period -- from approximately December 12, 2006 to January 24, 2007 -- in which she was absent from each of her scheduled shifts. During this period, Plaintiff would call into work before each scheduled shift to notify her shift supervisor that she would be absent. (Def.'s SJ Mem. SUMF ¶ 13)  Plaintiff made sure to notify her shift supervisor because she was aware of a personnel policy at the nursing home that allowed management to terminate an employee who failed to show up or call in for three scheduled shifts ("no call, no show policy") (Def.'s SJ Ex. 1, McLean County Nursing Home Personnel Policy at p. 5; Ptf.'s SJ Ex. 7, Phipps Dep. at pp. 78-80)  Before each shift, during this six-week period, Plaintiff apparently felt symptoms that she normally associated with the onset of

2

anaphylactic shock (Phipps Dep. at pp. 40, 53)  However, Plaintiff did not actually suffer an episode of shock at any time in January 2007.  (Phipps Dep. at p. 29)

On the afternoon of Friday, January 26, 2007, Plaintiff went to the nursing home and told Matthew Riehle, the Director of Nursing, that she was feeling better and wanted to return to work.  (Ptf.'s SJ SUMF ¶ 7)  Riehle told Plaintiff that before she could return to work, she was required to produce a physician's certification indicating that she was medically cleared to perform her job duties ("fitness-for-duty certification") (Def.'s SJ SUMF ¶ 18)  Plaintiff stated that she would be able to obtain one without a problem.  (Phipps Dep. at pp. 56-57)  During their conversation, Plaintiff asked Riehle whether she was on the schedule for her normal shift that night.  The parties dispute whether Riehle answered that question, but it is undisputed that the schedule was posted in the report room at the nursing home and that nothing prevented Plaintiff from accessing it.  (Phipps Dep. at p. 62)  Plaintiff was, in fact, scheduled for shifts on Friday January 26, Saturday, January 27, and Sunday, January 28 of 2007.  (Def.'s SJ Ex. 4, Phipps' Attendance Record for January 2007; Ptf.'s SJ Mem. at p. 2)

Plaintiff failed to show up for work on January 26-28 and did not call in to notify her shift supervisor that she would be absent.  (Phipps Dep. pp. 64-66)  On Tuesday, January 30, 2007, Plaintiff called the nursing home and Riehle notified her that her employment was being terminated for violating the nursing home's no call, no show policy with respect to her three consecutive January 26-28 absences.  (Ptf.'s SJ Resp. SUMF ¶ 21)

3

On May 18, 2007, Plaintiff filed suit in Illinois state court seeking damages for Defendants' alleged violation of her rights under the FMLA. On June 19, 2007, Defendants removed the case to federal court. And in April 2008, the parties filed the instant cross-motions for summary judgment.

## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court as to portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Once the movant has met its burden, to survive summary judgment, the "nonmovant must show through specific evidence that a triable issue of fact remains [as to] an issue on which [s]he bears the burden of proof at trial." Warsco v. Preferred Tech. Group, 258 F.3d 557, 563 (7th Cir. 2001); see also Celotex Corp., 477 U.S. at 322-24. "The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence." Chemsource, Inc. v. Hub Group, Inc., 106 F.3d 1358, 1361 (7th Cir. 1997).

4

This Court must nonetheless "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). In doing so, this Court is not "required to draw every conceivable inference from the record -- only those inferences that are reasonable." Bank Leumi Le-Isreal, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991). Therefore, if the record before the court "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 796 (7th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). However, in ruling on a motion for summary judgment, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

## ANALYSIS

The Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. § 2601, et seq., provides qualified employees with up to twelve workweeks of unpaid, job-protected leave per year for family or medical reasons. A core right under the FMLA is the employee's right to be restored to the position she held prior to approved leave, or an equivalent position. 29 U.S.C. § 2614(a)(1)(A), (B). Importantly, however, the FMLA does not require employers to reinstate employees who would not be eligible for reinstatement due to reasons unrelated to family or medical leave. 29 U.S.C. § 2614(a)(3)(B); Hubbard v. Blue Cross Blue Shield Ass'n, 1 F. Supp2d 867, 875 (N.D.

Ill. 1998). Unlike some other employment-related federal statues, the Act does not require an aggrieved employee to first exhaust administrative remedies before filing suit in federal court. See Manos v. Geissler, 377 F. Supp.2d 422, 427 (S.D.N.Y. 2005); Krohn v. Forsting, 11 F. Supp.2d 1082, 1085 (E.D. Mo. 1998).

Employees may exercise their right, under the FMLA, to time away from work in different ways. Some employees may need to take medical leave in a single block, e.g. for twelve consecutive weeks. Other employees may have medical conditions that require them to use leave time intermittently, e.g. one or two days a week, or even for several weeks in a row. See 29 C.F.R. § 825.203(a). Generally, intermittent leave is appropriate when an employee has a single qualifying reason for medical leave and requires periodic, rather than continuous, treatment of the underlying medical condition. Id. § 825.203(a), (c).

In this suit, Plaintiff seeks damages for her supervisor's and employer's alleged violations of the FMLA. Plaintiff seeks summary judgment on the issue of whether Matthew Riehle interfered with her alleged right to reinstatement by requiring her to produce a fitness-for-duty certification from a physician before returning to work after a period of approved medical leave. Defendants seek summary judgment on that same issue, and also on the issue of whether Riehle interfered with Plaintiff's right to reinstatement by terminating her employment shortly after Plaintiff indicated that she was ready to return to work after an extended period of medical leave. The facts material to a decision on these issues are not disputed. The Court finds that Matthew Riehle's demand that Plaintiff

produce a physician's fitness-for-duty certification before returning to work did not violate the FMLA.  Further, the Court finds that Riehle's termination of Plaintiff's employment did not violate the FMLA because the termination was based solely on Plaintiff's violation of the McLean County Nursing Home's personnel policy.

    I.  <u>Riehle's Demand that Plaintiff Produce a Fitness-for-duty Certification</u>

Plaintiff and Defendants both seek summary judgment on the issue of whether Riehle violated the FMLA by demanding that Plaintiff produce a fitness-for-duty certification before returning to work.  In arguing that a violation occurred, Plaintiff points to Department of Labor (DOL) regulation 29 C.F.R. § 825.310(g), which provides, "An employer is not entitled to certification of fitness to return to duty when the employee takes intermittent leave as described in § 825.203."  The validity and duration of Plaintiff's medical leave are not in dispute.[1]  What is in dispute is whether Plaintiff's consecutive, employer-approved absences from

---

[1] The Court, however, has serious concerns that Plaintiff may have abused her approved FMLA leave during December 2006 and January 2007.  Plaintiff admitted at her deposition that she was absent from work due to her illness for nearly all of January 2007 despite not suffering an episode of anaphylactic shock during that month.  Plaintiff's own deposition testimony seems to indicate that the primary reason she began to take continuous medical leave in December 2006 was because Donald Lee informed her that she could not use the accumulated paid sick time in her personal reserve account unless she called in sick for five consecutive scheduled shifts.  (Def.'s SJ Ex. 7, Donald Lee Dep. at pp. 32-33; Phipps Dep. at pp. 43-44)  Nevertheless, Defendants did not challenge Plaintiff on this issue and they do not raise it here.  As a result, the Court will not inquire further into it.

December 12, 2006 to January 24, 2007 constituted an increment of <u>intermittent</u> FMLA leave or a period of <u>block</u> FMLA leave. [2]

In making their arguments, both sides reference a DOL regulation that defines the contours of intermittent FMLA leave. The regulation provides that "[i]ntermittent leave may be taken for a serious health condition which requires treatment by a health care provider periodically, rather than for one continuous period of time, and may include leave of periods from an hour or more to several weeks." 29 C.F.R. § 825.203(c)(1). Plaintiff argues that her six weeks of consecutive, illness-related absences from December 12, 2006 to January 24, 2007 constitute a single increment of intermittent leave. Plaintiff points to a DOL regulation indicating that "there is no limit on the size of an increment of leave when an employee takes intermittent leave . . . ." 29 C.F.R. § 825.203(d). Defendants counter that Plaintiff's six week period of consecutive absences should constitute more than "several weeks" under the regulation.[3]

---

[2] The parties do not indicate in their briefs whether Plaintiff called in sick on January 25, 2007 or whether she was even scheduled to work that day. It appears, from Plaintiff's January 2007 marked-up work schedule (Def.'s SJ Ex. 4) that Plaintiff was scheduled and did call in sick. However, the parties do not contend, and the Court does not find, that this fact is material to the issues presented in the cross-motions for summary judgment.

[3] Plaintiff's summary judgment brief indicates that the DOL undertook an investigation of Plaintiff's claim that she was terminated in violation of the FMLA. The DOL determined, as a result of the investigation, that Plaintiff's six week period of absence was "more than the few weeks contemplated by the regulations." (Ptf.'s SJ Ex. 3 at p. 13) Defendants do not attempt to use the DOL finding as a preclusive device in this suit, and, in any event, the finding does not have preclusive effect here because it was not the result of an adjudicatory proceeding. See <u>Rekhi v. Wildwood Indus., Inc.</u>, 61 F.3d 1313, 1319 (7th Cir. 1995).

8

DOL regulations do not define the term "several" as it is used in § 825.203(c)(1). Black's Law Dictionary defines the word as "more than one or two but not a lot." 1378 (7th ed. 1999). Also somewhat helpful is 29 C.F.R. § 825.203(d), which, as Plaintiff has noted, indicates that "there is no limit on the size of an increment of leave when an employee takes intermittent leave . . . ." Most helpful, however, are the facts of the case. McLean County Nursing Home granted Plaintiff intermittent leave on October 2, 2006 for anaphylactic shock. (Def.'s SJ SUMF ¶ 11)  DOL regulations describe intermittent leave as "leave taken in separate blocks of time due to a single qualifying reason." 29 C.F.R. § 825.203(a). Moreover, "[i]ntermittant leave may be taken for a serious health condition which requires treatment by a health care provider periodically, rather than for one continuous period of time . . . ." 29 C.F.R. § 825.203(c)(1). The doctor's certification that substantiated Plaintiff's illness for FMLA purposes indicated that Plaintiff's episodes of anaphylactic shock were unpredictable and that there was no known end date to Plaintiff's condition. (Def.'s SJ Ex. 3, Dr. Marley's Cert. at pp. 1-2) Further, nursing home management never indicated to Plaintiff during her six week period of absence that the type or status of her FMLA leave had changed or would change. (Ptf.'s SJ Ex. 4, Riehle Dep. at pp. 15-17; Phipps Dep. at pp. 35-37) Management could have requested that Plaintiff obtain re-certification from a physician if there was some concern with the manner in which Plaintiff was exercising her leave time. See 29 C.F.R. § 825.308(a). Management, however, did not seem concerned. Plaintiff was allowed to simply call in each day, say she was

ill, and reference her approved FMLA leave. No more was said. (Phipps Dep. at pp. 35-37) In fact, there is no indication that management even recorded a change in Plaintiff's FMLA status in the nursing home's own personnel records. Therefore, the Court finds that Plaintiff, on January 26, 2007, sought to return to work from intermittent medical leave.

The heart of the issue, however, is not whether or not Plaintiff was on intermittent leave at the time she sought reinstatement. Rather, it is whether DOL regulation 29 C.F.R. § 825.310(g) constitutes a permissible construction of the FMLA. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844 (1984). That regulation states, "An employer is not entitled to a certification of fitness to return to duty when the employee takes intermittent leave as described in § 825.203." Under Chevron, a federal court must adhere to the following procedure in determining the weight to award an administrative agency's interpretation of a federal statute: (1) the court must ask whether Congress has directly spoken to the precise question at issue. If Congress' intent is clear, the court must follow it; (2) if Congress has not spoken directly to the issue, the Court must adhere to the agency's interpretation if it is a reasonable one. Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 86 (2002); Chevron, 467 U.S. 837 at 843-44; Harrell v. U.S. Postal Serv., 445 F.3d 913, 925 (7th Cir. 2006).

The Court finds that DOL regulation 29 C.F.R. § 825.310(g), as applied to the facts of this case, is an unreasonable interpretation of the FMLA. The FMLA, itself, does not distinguish between intermittent and block leave with respect to

employers' entitlements to fitness-for-duty certifications. The statutory text is silent on the issue. Therefore, the Court must determine if § 825.310(g) is reasonable in light of the goals Congress sought to achieve by enacting the FMLA. A central purpose of the FMLA is to guarantee medically necessary leave to employees in a manner that accommodates the legitimate interests of employers. See 29 U.S.C. § 2601. DOL regulation 29 C.F.R. § 825.310(g) ignores this desired balance. Its unreasonableness is demonstrated by the objectionable result that adherence to it would produce in this case.

 The regulation seems to conflict with DOL regulation 29 C.F.R. § 825.214(b), which provides that an employee's right to reinstatement after utilizing FMLA leave does not attach unless the employee is able to perform the essential functions of the position. The only appropriate way for an employer to be certain that an employee, after returning from extended medical leave, has the physical ability to perform essential job functions is to obtain a physician's statement to that effect. But, under § 825.310(g), an employer is <u>never</u> entitled to a fitness-for-duty certification from an employee returning from intermittent leave. The regulation reflects the DOL's assumption that all employees returning from intermittent leave -- no matter how large the increment of intermittent leave taken or the reason for leave -- are automatically fit for duty upon their return to work.

 Not all employees returning from long-term intermittent leave will be able to physically handle their job duties when they return to work following a serious illness. Some employees may believe that they are ready to work, only to discover

11

that they have overestimated their wellness and have returned to work prematurely. Yet § 825.310(g) forces employers to allow these optimistic employees to return to work without any objective medical proof that a return is medically advisable. The employee's automatic right to return to work creates the potential of putting other employees, patients, customers and clients in dangerous situations.

The Court understands that § 825.310(g) aims to protect employees who require intermittent leave from the potential employer-imposed burden of producing a fitness-for-duty certification following each and every increment of leave. And the regulation would be reasonable if the definition of intermittent leave were pared down to cover only employees who need to take one or two days, here and there, to treat an illness. But DOL regulations place no definite limit on the size of increments of intermittent leave that employees may take. See 29 C.F.R. § 825.203(d). As a result, employees such as Plaintiff are able to exercise intermittent leave in large blocks in order to recover from serious illnesses.

It defies common sense to prohibit an employer from demanding a fitness-for-duty certification before allowing an employee, who has been absent for six consecutive weeks due to a serious medical condition, to return to work. But that is exactly what § 825.310(g) requires here. The regulation does not even come close to striking a balance between employers' and employees' competing interests with regard to medical clearance for an employee's to return to work following leave. For that reason, § 825.310(g) works against the principle of balance to which Congress expressly refers in the text of the FMLA. See 29 U.S.C. § 2601(b).

The Court, therefore, holds that DOL regulation 29 C.F.R. § 825.310(g) is unreasonable as applied in cases, like this one, where an employee seeks to return from "several weeks" of intermittent FMLA leave without producing a doctor's certification stating that she is able to handle essential job duties.  Notably, the DOL seems to have caught its own mistake and has proposed changes to the regulation.[4]  Those changes have not yet been incorporated.  As a result, § 825.310(g) reads the same today as it read on January 26, 2007, when Riehle required Plaintiff to produce a fitness-for-duty certification.  Because the regulation is an unreasonable interpretation of the FMLA, the Court does not accept Plaintiff's reliance upon it.  The Court finds that Riehle acted reasonably in requiring Plaintiff to produce a fitness-for-duty certification before returning to work.  He did not violate the FMLA by doing so.  The Court denies Plaintiff's motion for summary judgment and grant's Defendants' motion on this issue.

II.  Plaintiff's Discharge from McLean County Nursing Home

Defendants seek summary judgment on the issue of whether Riehle's act of terminating Plaintiff's employment constituted an unlawful interference with Plaintiff's substantive right, under the FMLA, to be reinstated following her absence on approved medical leave.  Defendants argue that Plaintiff was not entitled to reinstatement because Plaintiff violated the nursing home's no call, no show termination policy.  Specifically, Plaintiff failed to show up for her scheduled

---

[4] The proposed changes appeared in the Federal Register, Vol. 73, No. 28 on February 11, 2008, and the DOL appears to be in the process of compiling public comments regarding the changes.

13

shifts on January 26, 27, and 28 of 2007 and did not call to notify her shift supervisor that she would be absent on those days. Defendants argue that Plaintiff's no call, no show violation constituted a legitimate and independent ground for terminating her. As a result, argue Defendants, nursing home management acted lawfully in refusing Plaintiff's request for reinstatement.

Plaintiff counters that she was under no duty to show up for work or call in on January 26-28 2007 because, on the afternoon of January 26, 2007, the Director of Nursing, Matthew Riehle, told Plaintiff that she was required to produce a fitness-for-duty certification before returning to work. Plaintiff claims that Riehle's demand for a doctor's certification was, itself, a violation of the FMLA, and that Riehle's unlawful demand effectively "unscheduled" Plaintiff from any shifts for which she was scheduled as of January 26, 2007. Plaintiff appears to argue that because she was under no duty to show up or call in on January 26-28, Riehle had no cause for terminating her.

In order to survive summary judgment on this issue, Plaintiff must produce evidence from which a jury could reasonably conclude that her termination was a violation of her right, under the FMLA, to reinstatement following her return from medical leave. See Hubbard, 1 F. Supp.2d at 875. As indicated above, Riehle acted reasonably despite the invalid requirement imposed on him by 29 C.F.R. § 825.310(g). But even if Riehle had acted unlawfully in requiring a physician's certification, his act did not "unschedule" Plaintiff from her January 26-28 shifts, as she contends.

14

As an employee at the nursing home, Plaintiff was subject to a policy by which management could terminate her if she failed to show up for three days of work without calling in to notify a supervisor on each missed day.[5] (Def.'s SJ Ex. 1, McLean County Nursing Home Personnel Policy at p. 5)  Plaintiff understood this policy. (Phipps Dep. at pp. 66-67)  Further, Plaintiff was scheduled to work shifts on January 26-28, 2007.  (Def.'s SJ Ex. 4, Phipps' Attendance Record; Ptf.'s SJ Mem. at p. 2)  There is a factual dispute as to whether Riehle told Plaintiff that she was scheduled to work those three days, but it is undisputed that nothing prevented Plaintiff from checking the schedule, which was posted in the nursing home's report room.  (Phipps Dep. at p. 62)  The evidence is uncontroverted that Plaintiff did not show up for her January 26-28 shifts and that she did not call to notify anyone at the nursing home that she would not be at work. (Phipps Dep. at pp. 65-66)  It is also undisputed that when Plaintiff called the nursing home on Tuesday, January 30, 2007, Riehle told her that she was fired for violating the nursing home's no call, no show policy for her January 26-28 absences.  (Phipps Dep. at pp. 64-65)

Plaintiff fails to adequately address the reason she did not notify anyone at the nursing home that she would not be at work on January 26-28, 2007. Throughout Plaintiff's period of intermittent FMLA leave, which began on October 2, 2006, Plaintiff called into work each day that she was absent due to her medical condition.  Specifically, from December 12, 2006 to January 24, 2007, the period

---

[5] It is unclear whether the policy required three consecutive days of no call, no show or just three total days of no call, no show during the course of employment.  The distinction makes no difference here.  And in any event, Plaintiff did not directly raise the issue in her briefs and has, therefore, waived it.

where Plaintiff did not work any of her scheduled shifts, Plaintiff called in to notify her shift supervisor that she was unavailable for each scheduled shift. (Ptf.'s SJ Resp. SUMF ¶ 13; Phipps Dep. at pp. 35-36)

Plaintiff claims that she was excused from her duty to notify her shift supervisor of a planned absence in light of Riehle's January 26, 2007 demand that she produce a medical certification before returning to work. Specifically, she claims that Riehle, by his demand for a doctor's certification, effectively "unscheduled" her from any shifts to which she was assigned over the weekend. Plaintiff's deposition testimony indicates that she may have genuinely interpreted Riehle's January 26, 2007 comments as excusing her from her scheduled shifts until she could produce a fitness-for-duty certification. (Phipps Dep. at pp. 64-65) Plaintiff stated that she believed that it was too late to acquire a doctor's certification on January 26, 2007 after Riehle told her, at approximately 4:30 p.m. that day, that she would be required to present one before returning to work. (Phipps Dep. at p. 64) Plaintiff further testified at her deposition that she did not believe any doctors were available over the weekend to issue a certification. (Phipps Dep. at p. 65)

Giving Plaintiff the benefit of the doubt, it may have indeed been too late for her to obtain a certification on January 26, 2007 or even over that weekend. But Plaintiff fails to show how her inability to obtain a certification excused her from <u>notifying</u> anyone at the nursing home that she would not come into work. Plaintiff may be implicitly contending that she was excused from calling in on January 26-28

16

because Riehle should have known that, given the timing of his certification demand, Plaintiff could not obtain a certification until after the weekend ended. But deposition testimony by both Riehle and Plaintiff shows that Riehle had reason to expect Plaintiff to show up for work at 11 p.m. on January 26, 2007 with a doctor's certification in hand. There was no implicit understanding that Plaintiff was expected not to show up. When asked at his deposition about Plaintiff's response to his certification demand, Riehle stated:

> A.  She said it would be no problem again to get the [doctor's] note, and she would be going to the doctor's office as soon as she left here, i.e., being the nursing home
>
> Q.  Do you recall what happened after that statement?
>
> A.  She left the building
>
> Q.  And I'm assuming that's the end of the conversation you had when she exited the building?
>
> A.  That was the end of the conversation.

(Riehle Dep. at pp. 33-32)  When asked at her deposition about her response to Riehle's certification demand, Plaintiff stated:

> A.  My next question [to Riehle] was -- I knew typically I'm scheduled for the 26th, that Friday, and so I asked him, Am I on the schedule tonight? Because I need -- I'm coming in.  And his reply was, You cannot come back unless you have a doctor's note.  I then told him that getting a doctor's note was no problem at all, and that I was -- I could get one.
>
> Q.  Was it your understanding that he was asking for a return to work note from your doctor or some sort of fitness for duty note from your doctor?
>
> A.  What I'm assuming is that he wanted a physician to say, Yeah she can work.

17

> Q. And so you told him, No problem, I'll get it?
>
> A. Uh-huh

(Phipps Dep. at pp. 56-57) Plaintiff did not say to Riehle, for example, "I'll get a certification on Tuesday, January 30, 2007 at my next doctor's visit, and until then I won't be coming in to work." To the contrary, Plaintiff simply said that the doctor's certification would not be a problem, and that was the end of it. Further, according to Riehle, Plaintiff said that she would get a doctor's certification immediately after she left the nursing home. Plaintiff's deposition testimony is consistent with that assertion.[6]

The lines of communication between Plaintiff and Riehle, on the afternoon of January 26, 2007, may have been tangled, but that does not mean that a FMLA violation occurred. It was Plaintiff's obligation to clarify what was expected of her after she left the nursing home on that date. Instead of clarifying the situation, Plaintiff made an incorrect assumption. In doing so, she committed a serious violation of the nursing home's personnel policy.

The bottom line is that Riehle's demand for a fitness-for-duty certification, regardless of its perceived validity at the time, did not automatically relieve Plaintiff of her duty to notify her shift supervisor that she would be absent, as she

---

[6] Even more, Riehle is the Director of Nursing, not the second shift supervisor, who Plaintiff usually called to give notice of an absence. Plaintiff had called the second shift supervisor every day that she exercised her FMLA intermittent leave from October 2006 through January 24, 2007. Given the fact that Plaintiff failed to call in on January 26-28, the second shift supervisor may well have expected her to show up and may have been caught off guard when she did not.

had done for each absence prior to January 26, 2007 while on FMLA leave.  The Court finds that Plaintiff was discharged solely as a result of violating the nursing home's no call, no show policy.  Therefore, Plaintiff's claim that her termination violated her right under FMLA to post-leave reinstatement is without merit.

## CONCLUSION

Plaintiff's motion for summary judgment is DENIED.  Defendant's motion for summary judgment is GRANTED.  The Court has set a telephonic status conference for October 24, 2008 at 1:00 p.m., at which time the parties shall advise the Court what issues in this case remain to be decided.

Entered this 7th day of October, 2008.

                                           s/ Joe B. McDade
                                           JOE BILLY MCDADE
                                           United States District Judge